We are now moving on to argument in Magellan Technology v. FDA. I'll give you folks a minute to get settled. Thank you. Mr. Heyer? Okay. Thank you. Mr. Heyer, am I pronouncing your name right, sir? Yes, you are. Okay, and am I correct that you've reserved three minutes? Yes, sir. Okay. You may proceed. Good morning, Your Honor. I'm going to please report Eric Heyer for petition of Magellan Technology. At the outset, there's one case that's in the room that I really want to stress, that I think maybe cuts through all the different arguments of that importance. It's cited, but it's not really emphasized as much as I'd like to emphasize here. It's a case out of the D.C. Circuit, General Electric v. EPA, 53 F. 3rd, 1324, and specifically 1328-29, where the D.C. Circuit, in a case that I think is very analogous to the situation here, said when an agency establishes a standard, they must do so with ascertainable certainty. That case had to do with how to get rid of hazardous chemicals in electrical transformers. And some very impenetrable regulations, I think, are analogous to the 55-page guidance on free market tobacco applications that EPA issued here. And I think applying that standard here, it becomes elusively clear that EPA never provided any reasonable assessment. Is that more on point than Prohibition Juice, the case that you're citing? It is, Your Honor. Yes, it is. Prohibition, there were a number of concessions that went into the law, and I don't think we could do that in any of my cases. And I don't think that point was necessarily argued in that case. So in here, there just was not reasonable notice. This evidence-sharing standard or standard for evidence in July 7th of 2021, internal memo of the FDA, was established well after the fact. This case, at its core, is really about EPA's procedural failures. Unfortunately, I think that some of the other circuits that have ruled against the industry in favor of FDA have conflated the inquiry of this FDA as statutory authority to require comparative efficacy evidence with looking at the procedural history of what FDA did in the lack of notice to regulated applicants. In the lack of notice, this was the specific requirements that FDA was going to have. They sprung it on that work that's happened. In fact, after the case of Magellan, Magellan had already spent millions of dollars to prepare an application following to the letter of the guidance that FDA had. Okay, but are you arguing, sir, that if the FDA had reviewed your marketing plan, it would have approved it? That's certainly, well, certainly the harmless error point. The relevant point on harmless error in New York public interest... No, I'm sorry, I'm sorry. Is the answer yes or no? Would they have approved it? They should have approved it, Your Honor. But it's not our obligation to prove at this point that they absolutely would have. The reality is that the procedure for review changed. The fact that they didn't review the marketing plan, they didn't review anything in the application other than looking for a randomized control trial, longitudinal cohort study, or just, quote-unquote, other evidence that shows a better switching rate for the flavored products versus the tobacco-flavored products. FDA looked at nothing else. And in so doing, as the ViviCorp, the 11th Circuit found, the FDA changed the review process, and that alone, that alone, and this is actually the ViviCorp example you can unhook, the way it was in my case, this is my case, this is one of the points that I argued, what the merits panel, there was a misapplication of the harmless error document. The mere fact that FDA changed the procedure is necessarily prejudicial, and so it necessarily must be remanded back to the agency. In this court, that only cited some of the 28J letters, what will be R125.4.52 goes to that same point. If the agency overloads material evidence according to the petitioner's claim, the petitioner is entitled to a remand without showing such evidence within the public decision in the petitioner's paper. Granted, it's an immigration case, but the same lackluster principle applies here. But isn't the question material, though? Right. I mean, even assuming that the FDA would have a better position had they reviewed the marketing plan, what happens if we think that even if they had, it would have led to a different outcome? I mean, are we compelled to waste taxpayer resources and money by sending back? Do we have any other room to maneuver? The primary reason, frankly, I think the marketing plan is a secondary argument. The primary reason it needs to be sent back is there was not adequate notice of this comparative. There was no notice of this comparative efficacy standard for evidence that FDA is now applying. Nagella is asking for a reasonable opportunity to satisfy and meet that standard, and if it's appropriately remanded, then if they get it remanded, then Nagella can go and do that. Nagella is only asking for a fair opportunity to meet this evidentiary standard that FDA has imposed. Okay. So what happens if we disagree that it's a new evidentiary standard? Well, then for the other materials that FDA overlooked, the court should still vacate and remand. Clearly there was a contradiction there on the failure to review the marketing plan as well as the other evidence and benefits that were to adult users of cigarettes that were found in the application. And some of those materials are outlined in the brief, in our petition brief, in pages 42 through 44. Nagella did exactly the studies, the behavioral studies, the single point in time studies, perception and intent studies that FDA instructed it to do. After the fact, FDA said, well, those are robust and reliable. They've changed their mind. In fact, in footnote 6 of the TPL report, FDA said, based on what we've learned in reviewing these, after they were due, we decided they're not robust and reliable. But the evidence are things like 18 to 19% of respondents in these surveys saying, I would like to use this product or I plan on using this product. Why can't an agency decide after the submission of applications that the comparisons used or the tests used are actually not efficacious and don't protect children from becoming addicted to cigarettes? Can they not act on that basis? They can, and the proper thing to do is to give notice to regulated industry and a fair opportunity to undertake the studies. If there's a shift in policy, to announce the shift in policy, give a reasonable fair opportunity to meet the governational standard as opposed to applying it and enforcing it immediately without any notice to regulated industry. Does the rejection of your application mean that you cannot reapply, say on pretzel flavor or whatever it is, and show that that's going to cause more current smokers to quit than it'll attract kids to start? They could, Your Honor, but there's a point here I want to make. My client, John, still has a mental health flavor products pending. And there's actually, we just learned at the end of last week, we're going to file a notice, I don't know, a notice, another request for a judicial notice that this is not yet publicly available in cases in the third district. FDA, back in December 2020, three months after these were due, were telling certain applicants in deficient stores that our client never received that they should compare other flavors to menthol flavor and group menthol like tobacco. Now, after the fact, in 2022, FDA has said, well, we'll treat menthol differently. And so FDA treated even different applicants differently in terms of giving them notices. Even when they did that in December 2022, it didn't stay the same. You're saying that they're going to treat menthol the same as pretzel or raspberry? Just in the last six months, Your Honor, so we need to draw a line and see, even if for these particular products we can reapply, a line needs to be drawn in the sand here because this is an agency run by. If other agencies follow this, any time they feel like they can move the rule books, come up with an evidentiary standards after the fact, and deny whatever is politically expedient to deny, this agency should not be accountable. If I can just make sure that we're crystal clear, when you are saying a policy change, you're not actually saying they were looking for X and now they're looking for Y. You're saying that the evidence to prove X in one circumstance is this, and in another, the evidence to demonstrate X is something different, right? You're not actually saying they were once looking for something entirely unrelated to health or effect on children. Is that right? Your Honor, this is a policy shift. It's clearly a policy shift because the result of this new standard for evidence has been— But it's an evidentiary standard. It's not actually, oh, at one point we thought that end product needed to clean the air, and now they're deciding end products need to be safe for children. In this case, they're saying the way that you prove the standard for public health is these kinds of studies, and then they provided different words, right? You're not actually saying that there was a different policy goal, just a different evidentiary standard for meeting the same policy goal. Well, the policy goal may have been the same, but now effectively what their position is is if the device itself doesn't have some technological feature that would lock out children, they're never going to prove it. So if that's not a policy, I don't know what is. And this is the way we're trying to get to that. But the regulation that was in place told you that in order to decide whether the public health would be assisted by— and has to be affirmatively assisted by this deemed tobacco product, there has to be a showing that there's a likelihood that existing users will stop and a likelihood that those who don't use will start, and that you have to balance those. So I don't know how you do that on a study that's taken, you know, in one week. Well, there was no regulation in the first place. The only thing— When was this regulation enacted? After the denial of— 387JC4. I don't know. Does the statute say that? Well, yes. But that's what the statute says. Sorry, I said reg, but it's a statute. But this is deemed a tobacco product. So if it's deemed a tobacco product, then those characteristics and dangers that are associated with tobacco products are deemed to adhere in your product. Well, so it's true that so many other things are also deemed tobacco products, but there was no specificity that this comparative efficacy study against tobacco flavor was what needed to be had. This was all announced 10 months—almost 12 months after the fact, in late August of 2021. And that's where I come back again to the general record piece. There's no reasonable—there's no ascertainable certainty ahead of time, which is what the general record speaks to, as to what FDA was requiring. And so they smoothed the vocals on a lot of different things. The types of studies that they said they would look at, what marketing and sales access restrictions, what the impact goals were would not be. And there's a whole list of different things that were moved because of this new policy Okay, so I think we'll hear from you in a moment. Mr. Hickson? Good morning, and may it please the Court, David Hickson, the government. The courts of appeals for the D.C. Third, Fourth, and Seventh Circuits have all recently denied recently upheld marketing denial orders similar to the one issued here, rejecting the very same arguments agreed here and on similar records. This Court should likewise uphold FDA's order because the petitioner failed to carry its statutory burden to demonstrate that the marketing on the compromise would be appropriate for the protection of the public health. In the absence of that evidence, it should have shown that the statute required an FDA denial. Didn't the agency say over and over again that it doesn't expect that long-term clinical studies, those lasting six months or longer, will be needed for each application? And if they don't expect it, why would anybody undertake the expense and bother doing it? It's important that a petitioner's application was denied not because it lacked a long-term study, and that's a study that lasts six months or longer, but because it omitted any robust and reliable evidence of behavior change. And how does it get to be robust and reliable? That robust and reliable is strong, that it's not reproducible, that it's not subject to variations in test design, that controls the bias. And here, FDA explained in the 2019 guidance that applicants needed to show the trends by which their products were used over time. That's on page 35. And FDA also explained the types of studies that could be used. Here I'm looking at pages 12 and 13 of the 2019 guidance. FDA explained that you could use a long-term study to show that, but FDA also explained that applicants could demonstrate possible long-term health impacts by extrapolating short-term studies. Okay, so I agree that there was conditional language used in the 2019 guidance, but when you look at at least the July 2021 internal memo and the press releases and the format of the reviews, it seemed to at least give a good argument that they went from not likely needing a long-term study to probably needing a long-term study. Is that a shift in position? No, FDA did not follow the approach suggested in that July 2021 memorandum. That was superseded. I completely agree that it was superseded, but it is probative of where people were thinking, right? I mean, at the very least, we need to be thinking about how the decision makers were approaching the importance of the efficacy. And what I'm interested in is having you help us figure out where we draw the line. Like, at what point does it become enough of a shift that it becomes actionable? Well, here it's critical that FDA decided to look at that other effort. It's in the August memo and, most critically, in the record here in the— I'm sorry, can I ask you to move your thing closer? I'm having a hard time hearing you. Oh, my apologies. Thank you. It's good that FDA instructed its reviewers to look for other evidence beyond a longitudinal study or a randomized control study. And that's shown in the record that the reviewers looked for other types of evidence and reviewed the petitioner's studies and determined that they lacked robust and reliable evidence of a benefit to adults over time. So, but is there—when deciding the shift from the likely not need to maybe likely need, is there some sort of reliance interest that went into the formulation of that, or should there have been? There was no shift in policy. Again, FDA explained in the 2019 guidance that applicants needed to show product use over time. And FDA was clear that applicants could do that through long-term studies, but that FDA would consider other types of evidence, like short-term, shorter-duration studies, which is the same thing that FDA said in the decision document here, when it noted that shorter-duration studies could also be relatively reliable. I'm sorry, so is it your position that there was zero shift, as opposed to a different emphasis? There was zero change? It didn't go from a slight to probably not, or— The approach in reviewing the petitioner's application wasn't, I guess, consistent with the 2019 guidance. Okay, then why did they reissue it, then? If it was 100—like, why did they have to reuse different words if it was exactly the same? I'm not sure I can follow that question. Why did they need to issue the August 2021 if it was exactly like the 2019, in terms of the evidentiary standard? There was an external memo describing to FDA's scientific reviewers the types of evidence to look for in the application. The 2019 guidance was to external partners, because the 2019 guidance also explained that, aside from shorter-duration studies, applicants could also do long-term studies done on other products, as long as they were able to adequately bridge them to their product. That just would possibly explain why those studies and the data there were applicable to the products. Does the record show why the August 2021 internal memo had such a short shelf life? Gone within a month? The July one. I'm sorry, the July. The July 2021 was rescinded the next month. Why? FDA was considering, if not evaluated, the direction to apply to its evaluator, and FDA had been reviewing these applications and instructed them that they should consider other evidence. And I think it's critical here that FDA, in the 2019 guidance, told applicants that they would need to— that the information would be considered on a case-by-case basis, and that FDA would review it to determine whether it was valid scientific information. But one could read the October 2021 final rule as basically requiring a long-term epidemiological evidence, because it says that where an application contains no long-term epidemiological evidence regarding the product or that could be bridged to the product, FDA would consider whether there are other sources. So basically, the preferred and privileged way of showing this balance of health considerations is a long-term epidemiological evidence. Well, FDA explained both in that final rule in 2021 and its 2019 guidance, and in evaluating here, that you could do either a long-term study or short-term studies, along with second to other literature. And as the D.C. Circuit observed here, what FDA was saying then is it wasn't going to limit applicants to those two types of long-term studies that it would usually require, but that FDA would consider other types of evidence. Has the FDA actually issued a pre-marketing approval based on other evidence? FDA has not approved a flavored ID cigarette as of today, but other applications remain under review. Okay, so at this point in time, nobody who has submitted something without a long-term study has gotten approved. Is that fair to say? At this time, no one has been approved. Those who have provided more robust evidence, they're still under scientific review. And this study, whatever it is, long-term or short-term, would have to be flavor by flavor, like pretzel, raspberry, tutti-frutti, whatever. It would need to assess petitioner-specific products. Yes, but you would view each flavor as a different product. FDA did explain that if an applicant has similar products, similar flavored products, that it may be able to bridge those results from one product to the other, so you may not need to do a long-term study about each specific product as long as you can explain why the results about pretzel bran are applicable to mango. If the products are similar enough, again, you can explain why those results should apply. Can I just ask, if we think that the failure to review the marketing order was arbitrary or capricious, what do you think we should do? In that circumstance, assuming you find it to be error, it would have to be harmless error, and that's because the petitioner doesn't offer anything materially different, anything novel, compared to what FDA discussed in the 2020 enforcement guidance. Petitioner concedes this in its reply break, stating that the 2020 guidance describes exactly the types of measures. But the part that I'm concerned about is this post-talk rationalization, right? Like, how does one actually know that it's harmless unless you evaluate what the marketing plan looked like? Well, FDA previously, the 2020 guidance, and again, evaluating the application here, concluded that sales and advertising restrictions, as a categorical matter, weren't affected. And here... So, as your position, you guys got lucky, right? That whatever they did was just run-of-the-mill, like everything else, and so it was harmless error. But, like, are we in a position where we have to, in the first instance, decide if you got lucky? No, under the harmless error statement, under SHINESKI, it's the party in the circuit error who has a burden that points to something in the record demonstrating prejudice. And prejudice depends on the likelihood that the outcome would have been different. And here, just as in the D.C. 3rd and 4th Circuit cases, Petitioner doesn't offer anything material, doesn't have a content that offers anything materially different than what was in that guidance. So there is no prejudice, and any error would have been harmless. Okay. Is there anybody else? Okay. Thank you so much, sir. Thank you, Erin. And, Mr. Harre, you've got your three minutes. Thank you, Erin. Counsel made the point that, according to FDA, the application was not denied because of that long-term study data, but because of that supposed robust and reliable data. The only reason they don't consider it to be robust and reliable is because it's not been compared to... Even setting aside the long-term, short-term distinction, it's not the specific comparative efficacy study comparing a subject-flavored product against a tobacco-flavored men's product that FDA now requires. Again, it's a new standard that FDA imposed unilaterally sub salientio ten months after the application was reviewed. It's entirely logical. It's a circular argument. Counsel claimed that FDA looked for, quote, unquote, other evidence, and that there was not sufficient other evidence. But as the TPL report indicates, regardless of whether it's a randomized controlled trial, a longitudinal cohort study, or other evidence, that other evidence, any three of those sort of tests all in the same bucket of it must be comparative efficacy evidence, showing that the switching rates or the tobacco cessation rates, the efficacy of the flavored product is better than that of the tobacco-flavored product for cigarettes. Again, it all comes back to the new standard that was not readily ascertainable ahead of time. It sprung out of applicants after the fact. Counsel claimed that there was no, quote, unquote, no shift in policy. Again, looking at the 2019 guidance, looking at everything FDA said publicly before August 26, 2021, there was no indication that this specific comparative efficacy comparison of flavored product versus tobacco-flavored product on smoking cessation was required. No notice whatsoever. The August 2021 internal memos, FDA required things that were never disclosed, never mentioned, entirely a subsequent to policy. But doesn't the statute itself suggest that there has to be the balance of risks and benefits to the population as a whole, including users and non-users, and taking into account the likelihood that existing users will stop using such products, and the likelihood that those who don't use them will start, and the ones that don't use them would include young people? It does. Going back to the word we go out a lot, that's far from the very specific, hyper-specific, uber-specific comparative efficacy test that FDA now requires. That general statutory language is a far cry from FDA conveying to applicants, you need to do an RCT, a longitudinal cohort study, or some sort of other comparative efficacy study on your product versus tobacco-flavored products. Again, the broad market, the whole idea of the moving on risk is to move smokers, cigarette smokers, which are far more harmful, 90% more harmful than these products in the past, away from cigarettes and either of these products. The notion that anyone had any reasonable notice that this sort of comparative efficacy standard, which does not compare the products directly to a cigarette, but, correct, compared to one product to another, with the effect on switching off a cigarette. Again, that's not reasonable. There's no reasonable applicant that ever kind of predicted that. There's a Chrysler case out in the D.C. Circuit that says, if you would have, back to my characterizing, if you would have needed the aid of a psychic to figure out what it was that the agency was requiring, that's more than the law requires. That's exactly the case. There was no notice whatsoever interacting with that. And then, finally, the point of prejudicial fear. Again, because there was a change in the procedure used, that alone, as a matter of the law, establishes prejudicial fear. The burden is not on us to show, it's not on the applicant to show, or the judge to show, that they absolutely would have granted a marking order. It's a very similar thing about Justice Scalia in Article III standing, and the issue of notice-and-comment rulemaking. If it's a regulation that required an opportunity to require notice and comment, then one becomes almost prejudiced by not having that opportunity to comment. One may not show that the outcome of the rulemaking could have been different, and that the agency would have adopted one's position. It's the mere depriving one of the opportunity to comment, one's procedural rights and due process rights in that regard, that gives one Article III standing. It's the same point here. And, in fact, there were many points in the marketing plan, and so I'll rattle this one very quickly, that would have suggested that perhaps an FDA would have come up with a problem, weighing all the risks and benefits in the way it does. It's clearly a balancing test. And those are outlined in the brief. But, again, pages 37 through 39, things like only selling in age-dated bake shops, things like not using social media influencers or models under the age of 25 in criminal products, lots of things that were not even suggested in the 2020 Enforcement Act. Again, it's Judge Jones and the Fifth Circuit dissent. Well, it appears that the FDA doesn't consider that that will actually stop kids who want this product from getting it. It's like keeping kids from going into R-rated movies. I mean, they're just going to get in one way or the other? That's what they've concluded now, but that's not what they said before. Again, it's a policy shift. It's a cross-the-board policy shift that's embedded in this new standard for evidence. That's not what they said before. So, there are, again, there are a number of things that are well-pointed in 37 through 39 of our opening, Fisher's opening brief, that were specifically intended, punitive actions against retailers that sold to you. Again, only marketing had been point-of-sale or age-dated restricted bake shops, not your general convenience store. What FDA looked at when they came up with that 2020 Enforcement Guidance is they looked at submissions from companies that sold primarily convenience stores, so anybody from any age can walk into a corner convenience store. That's not what Magellan proposed here. Magellan proposed our products would be sold in age-dated bake shops, so you must be 21 even to walk through the door. So, these are all the things that FDA ignored when it failed to review the marketing plan. That's why it must be vacated. It must be remanded for FDA to, as promised, include it in the guidance and before these applications came in. Look at the entirety of the application and weigh the risks and benefits, and also, if the board finds appropriate, to give Magellan the opportunity to go now and try to meet this new evidence and conduct one of these comparative evidence studies. They can't do the study on something on which they haven't been noticed, and that's what happened. Thank you. Take care. Thank you.